IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**DAVID A. REED,**

        **Plaintiff,**

v.                                    **Civil Action 2:20-cv-355**
                                          **Judge Sarah D. Morrison**
                                          **Magistrate Judge Jolson**

**COMMISIONER OF
SOCIAL SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, David A. Reed, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). For the reasons set forth below, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

**I.    BACKGROUND**

Plaintiff protectively filed his applications for DIB and SSI on June 29, 2016, alleging that he was disabled beginning October 24, 2015. (Doc. 6, Tr. 274–88). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a video hearing on August 6, 2018. (Tr. 63–88). On November 30, 2018, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 15–28). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–5).

Plaintiff filed the instant case seeking a review of the Commissioner's decision on January 22, 2012 (Doc. 1), and the Commissioner filed the administrative record on March 23, 2020 (Doc. 6). This matter is now ripe for consideration. (*See* Docs. 7, 9, 10).

**A.    Relevant Medical History and Hearing Testimony**

*1.    Medical History*

The ALJ summarized the relevant medical records as to Plaintiff's physical impairments:

Diagnostic imaging of the [Plaintiff]'s lumbar spine show mild findings. September 2016 magnetic resonance imaging (MRI) of his lumbar spine revealed mild unchanged disc desiccation at L2-L3 as compared to February 2014 imaging, and no significant spinal canal stenosis or neural foraminal narrowing (C7F/27–29).

Physical examinations reveal the presence of low back pain. In April 2016, Casey Chamberlain, DO, administered a physical examination of his lumbar spine in which the [Plaintiff] elicited pain when twisting to the left, and sacroiliac joint tenderness with palpation (C7F/25). His facet loading test was positive, but straight leg raising test negative bilaterally, and he exhibited full motor strength in his bilateral lower extremity. Incidentally, during his May 2016 mental health counseling sessions, he reported re-injuring his back while playing baseball with his children (C4F/66). He presented for continued low back pain in July 2016, and was assessed with facet arthritis of the lumbar region, lumbar degenerative joint disease, and chronic low back pain without sciatica (C2F/8–9). Dr. Chamberlain recommended outpatient physical therapy (he last completed physical therapy more than 12 months ago) for core strengthening, a home exercise program, and an updated MRI if his symptoms persisted. The [Plaintiff] was offered conservative modes of treatment for pain. In October 2016, he underwent placement of a lumbar medial branch block at L4-5, L5-S1 (C7F/34–35), and the following month, lumbar medial branch radiofrequency neurolysis (C7F/30). In March 2017, he again presented to Dr. Chamberlain for low back pain, and upon physical examination elicited reduced lumbar range of motion, increased pain with straight leg raising, tenderness to palpation of the sacroiliac joint, paraspinal muscle spasm bilaterally, and full bilateral dorsiflexion (C7F/6–7). Dr. Chamberlain assessed lumbar spondylosis, degenerative disc disease, chronic low back pain, and chronic pain. On June 12, 2017, the [Plaintiff] underwent a right iliolumbar injection for pain (C12F/29–30).

January 2016 MRI of his left knee revealed no significant degenerative changes, no acute osseous abnormality, and stable superior patellar spurring (C2F/5–6). His treatment record reflects minimal improvement with injections, anti-inflammatories, pain medication, physical therapy, and bracing (C2F/21–22). Upon physical examination, he elicited pain to palpation of the left patellofemoral joint; his range of motion was grossly intact. James Thompson, DO, assessed

2

> patellofemoral syndrome of the left knee. Three months later, MRI of his left knee revealed a Baker's cyst and ganglion, but no ligamentous, tendinous, or meniscal finding to account for the [Plaintiff]'s reported pain (C3F/9). In June 2016, Brian Cohen, MD, recommended more therapy for his continued pain symptoms (C2F/11).
>
> Nearly two years later, in February 2018, the [Plaintiff] underwent physical therapy for bilateral knee symptoms (C14F/2–19). March 2018 MRI of his right knee revealed no significant degenerative changes, and evidence of a small meniscus tear (C12F/25–26). Later that month, he underwent a right knee arthroscopy lateral release (C12F/5). In April 2018, when presenting for orthopedic aftercare, he reported working on his shed, and upon exiting, stepping on a piece of siding with his right leg and sliding, causing his right knee to extend forward (C12F/2–3). On examination, his knee was tender to palpation, and range of motion limited secondary to pain; he ambulated independently, and was neurovascularly intact with regard to bilateral lower extremities. Certified physician's assistant, Amanda Baumgardner, recommended ice, elevation, anti-inflammatories, supportive shoes, and gentle exercises.

(Tr. 22–23).

Analyzing Plaintiff's mental impairments, the ALJ summarized the relevant medical records:

> Regarding the [Plaintiff]'s mental symptoms, his mental health treatment record reflects treatment for at least two years since his initial mental health assessment in October 2015. During the [Plaintiff]'s October 2015 assessment, he was noted as living with his wife and her parents due to financial difficulties (C4F/8–20). He reported depressive symptoms, low energy, irritability, over-eating, little interest in doing things, restless sleep, and hypersomnia, and diagnosed with major depressive disorder. The [Plaintiff] reported depressive symptoms since his teenage years but indicated exacerbation with job loss, health problems, and financial difficulties. Individual mental health counseling was recommended to improve his coping skills, men's group for emotional support and increased socialization, and referral for psychiatric evaluation.
>
> During his November 2015 initial psychiatric evaluation at Scioto Paint Valley Mental Health Center, he was noted to have major depressive disorder, moderate, ranking depression at 5/10 (C4F/42–46). At his mental status evaluation, the [Plaintiff]'s mood was noted as depressed and anxious; affect, constricted; estimated intelligence, average; attention span and concentration, fair; thought process mostly goal directed, but circumstantial at times; abstract reasoning fair; thought content and perception, no delusions, no suicidal or homicidal ideations. His insight and judgment was documented as fair, and memory fair. Notably, he shifted throughout the interview and was in notable pain. He ambulated

3

independently but with a limp. Interventions provided included supportive therapy, and medication management. Cymbalta increased, Elavil discontinued, Vistaril, trazodone, and Wellbutrin prescribed. During his January 2016 visit, he reported a decline in mood, lack of energy, difficulty concentrating, and sleeplessness (C4F/48–50). His Cymbalta and trazodone dosage was increased, Wellbutrin discontinued due to suspected agitation, and Lyrica prescribed (C4F/50). In March 2016, his medication was again adjusted and he was also prescribed melatonin (C4F/55).

By July 2016, mental health counseling individual progress notes document satisfactory progress in treatment (*see* C6F/4, and C6F/6). He reported continued tiredness, but indicated sleeping 6 hours each night. In August 2016, he reported feeling better due to being able to go on vacation. His mental status examination was within normal limits. He continued to receive psychiatric treatment for major depressive disorder with supportive therapy, medical evaluation and management through at Scioto Paint Valley Mental Health Center through at least December 2017 (6F/27–32).

(Tr. 24–25).

2. *Relevant Hearing Testimony*

The ALJ summarized the testimony from Plaintiff's hearing:

At the time of the hearing, the [Plaintiff] testified to having a height of 5 feet 11 inches, weight of 300 pounds (weight has fluctuated between 275 pounds and 300 pounds for the last three years), being separated from his wife, and living alone. He previously lived with his wife and three children.

The [Plaintiff] testified to having a limited ability to work due to both physical and mental health symptoms. Physically, he indicated having problems with his back and knees. With prolonged sitting or standing, "pain shoots up [his] back" and stays in his lower to middle back. He has numbness and tingling in his legs that "comes and goes" but he indicated uncertainty of such related to his back pain. Injections and physical therapy provided no significant pain relief for his back or knee pain. Surgery on his bilateral knees has also provided no significant pain relief. Pain medication is his current mode of treatment for both back and knee pain.

Mentally, he testified to having roaming thoughts of hurting others (though he never would), and an awful attitude. He has lashed out at his wife and children, and has limited toleration for others. Every three months he visits with a psychiatrist since beginning treatment in September 2015. He received counseling for two to three years, ending between January, or February of the current year. Cymbalta provides little help, and medication side effects cause tiredness with standing, and lightheadedness. Mentally he is able to remember what he has watched on television; he socializes with one friend and sometimes goes out with him.

4

> He reported somewhat limited activities of daily living. During the summer, he eats after waking up and goes outside, sits on the porch, or walks around the yard. In the winter, he stays inside and watches television. Two to three times each day he lays in the recliner, due to back pain, and naps. He stopped performing yard work seven to eight years ago when he was no longer able. He does not clean but declutters his own belongings. He performs personal care items independently, but showering and putting on his pants has become a struggle. He reported driving two to three times weekly, up to thirty minutes at a time. He frequents stores, occasionally grocery shops, and cooks simple microwaveable meals. Now that he lacks income, he relies on his relatives for food. Due to his impairments, he can no longer golf, go fishing, play sports with his children or work (C3E/2). He is able to walk a couple of blocks and sit/stand for 10 to 15 minutes before experiencing pain (he alternated between sitting and standing during the hearing). Lifting more than 20 pounds would cause pain.

(Tr. 21–22).

### B. The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirement through December 31, 2016, and had not engaged in substantial gainful employment since October 24, 2015, the alleged onset date. (Tr. 18). The ALJ determined that Plaintiff suffers from the following severe impairments: degenerative disc disease of the lumbar spine, patellofemoral syndrome of the bilateral knees, obesity, and major depressive disorder. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

> [T]he [Plaintiff] has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except he can never climb ladders, ropes or scaffolds; and can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. He can have occasional exposure to unprotected heights, dangerous heavy moving machinery and vibration. He is able to understand, remember and carryout simple routine tasks; and use judgment limited to simple work[-]related decisions.

(Tr. 21).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements

5

concerning the intensity, persistence and limiting effects of [his] symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 22).

As for the relevant opinion evidence, the ALJ first considered the opinion of the State agency medical consultants at the initial and reconsideration levels of review, "similarly limiting [Plaintiff] to a sedentary exertion," but giving only "partial weight" to their opinions adopting the prior ALJ's finding that Plaintiff is capable of performing a full range of sedentary work "because the hearing level evidence support greater physical limitations with respect to [Plaintiff's] ability to perform postural maneuvers." (Tr. 26). Next, the ALJ considered the opinion of one of Plaintiff's treating physicians, Dr. Casey Chamberlain, who opined, in April 2017, that Plaintiff could sit for four hours, stand/walk for two hours, required unscheduled breaks, could occasionally lift ten pounds, rarely lift fifty pounds, never stoop, rarely twist, twist, crouch, or climb ladders/stairs, and would be absent more than four days of work each month. (*Id*.). The ALJ afforded "little weight" to the opinion, explaining that "such limitations more restrictive than those provided in the above residual functional capacity are unsupported by Dr. Chamberlain's treatment record which document full strength in [Plaintiff's] bilateral lower extremity, diagnosis of degenerative disc disease without sciatica, and only conservative modes of treatment recommended for his pain." (*Id*.). The ALJ also found that Dr. Chamberlain's opinion "is also unsupported by MRI findings revealing evidence of only mild disc desiccation at L2-L3, and no significant spinal canal stenosis or neural foraminal narrowing." (*Id*.).

Relying on the VE's testimony, the ALJ concluded that Plaintiff could not perform his past relevant work as an order picker, delivery driver, parts assembler, or wheel wright, but could perform jobs that exist in significant numbers in the national economy, such as an assembler,

6

inspector, or surveillance system monitor. (Tr. 27–28). She therefore concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, from October 24, 2015, through the date of the decision (20 CFR (20 CFR 404.1520(g) and 416.920(g))." (Tr. 28).

## II.     STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III.    DISCUSSION

In his sole assignment of error, Plaintiff argues that the ALJ failed to properly evaluate the opinion of his treating physician, Dr. Chamberlain. (Doc. 7 at 7–12). The Undersigned agrees.

Dr. Chamberlain, along with other physicians at the same practice, began treating Plaintiff for his low back pain in early 2016. Specifically, Dr. Chamberlain saw Plaintiff over ten times between early 2016 and mid-2017. (*See, e.g.*, 421–22, 655–56, 661–62, 673–78, 689–90, 691–92, 695–96, 701–02, 704–05, 826–27, 829–30). At each appointment, Plaintiff reported symptoms of pain, including lower back pain at a level of eight out of ten in intensity. (*See, e.g.*, Tr. 650; *see*

7

*also* Tr. 653 (seeking second opinion "[d]ue to failure of multiple conservative treatment options without surgical indication" to consider "potential neuromodulation or intrathecal pain pump")). Dr. Chamberlain repeatedly recommended Plaintiff undergo a medial branch block "as he has failed all other conservative options." (*See, e.g.*, Tr. 421).

In April 2017, Dr. Chamberlain completed a "Lumbar Spine Medical Source Statement." (Tr. 681–84). On it, he noted Plaintiff's diagnoses as lumbar spondylosis, lumbar degenerative disc disease, and chronic low back pain without sciatica. (Tr. 681). As for Plaintiff's prognosis, Dr. Chamberlain noted "pending second opinion from OSU spine center—pain unchanged." (*Id.*). For clinical support, Dr. Chamberlain noted MRI results revealing mild disc desiccation at L2-L3. (*Id.*). Dr. Chamberlain noted Plaintiff's symptoms as "pain with bending, knots in low back, muscle spasm, tingling/numbness in legs, knee pain, aching, stabbing pain, pain worse with prolonged activity, sitting, standing." (*Id.*). He further noted Plaintiff's "low back pain[is] suggestive of discogenic etiology" and that Plaintiff's "daily pain level [is an] 8 out of 10." (*Id.*). For "positive objective signs," Dr. Chamberlain checked the boxes for "muscle spasm" and added "facet loading positive," "minor decreases in trunk flexion/extension (10%), and minor decreases in hip flexion (20%)." (Tr. 682).

As a result of Plaintiff's impairments, Dr. Chamberlain estimated that Plaintiff could: walk less than one city block without rest or severe pain; sit for forty-five minutes to two hours before needing to get up; stand up to one hour before needing to sit down or walk around; and sit for four hours total and stand/walk for about two hours total in an eight-hour workday. (*Id.*). Dr. Chamberlain further opined that Plaintiff requires a job that permits shifting positions at will from sitting, standing, or walking and needs to include periods of walking around during an eight-hour workday. (Tr. 682–83). Specifically, Plaintiff must be able to walk every twenty to forty-five

minutes for five minutes at a time and will sometimes need to take unscheduled breaks during a working day. (Tr. 683). Next, Dr. Chamberlain noted that Plaintiff can rarely lift twenty or fifty pounds but can occasionally lift up to ten pounds. (*Id.*). He further noted that Plaintiff can rarely twist, crouch/squat, climb ladders, or climb stairs, and can never stoop (bend). (*Id.*). Finally, Dr. Chamberlain noted that Plaintiff is capable of "low stress work" and would likely miss more than four days a month due to his impairments or for treatment. (Tr. 684).

Because Dr. Chamberlain is a treating physician, two related rules govern how the ALJ was required to analyze his opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016).[1] The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (alterations in original)); *see also* 20 C.F.R. § 404.1527(c)(2); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550–51 (6th Cir. 2010). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

---

[1] Effective for claims filed after March 27, 2017, the Social Security Administration's new regulations alter the treating physician rule in a number of ways. *See* 20 C.F.R. §§ 404.1527, 416.927 (2016).

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citation and quotation marks omitted). "Because the reason-giving requirement exists to 'ensur[e] that each denied claimant receives fair process,' we have held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and explaining precisely how those reasons affected the weight' given 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified upon the record.'" *Blakely* 581 F.3d 399 (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d at 243 (alterations in original)). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

Applying the above standards here, the Undersigned concludes that the ALJ failed at both steps. The ALJ had the following to say about Dr. Chamberlain's opinion:

> The undersigned has considered but given little weight to the April 2017 medical source statement of Casey Chamberlain, DO, assessing the [Plaintiff] with the ability to sit 4 hours; stand/walk 2 hours; requiring unscheduled breaks; occasionally lifting 10 pounds, rarely lifting 50 pounds, never stooping; rarely twisting, crouching, climbing ladders/stairs; and absent more than 4 days of work each month (C8F), because such limitations more restrictive than those provided in the above residual functional capacity are unsupported by Dr. Chamberlain's treatment record which document full strength in the [Plaintiff]'s bilateral lower extremity, diagnosis of degenerative disc disease without sciatica, and only conservative modes of treatment recommended for his pain (C7F/25, 6–7, C2F/8–9). Such is also unsupported by MRI findings revealing evidence of only mild disc desiccation at L2-L3, and no significant spinal canal stenosis or neural foraminal narrowing (C7F/27–29).

(Tr. 26).

10

"[T]he ALJ's errors are twofold: (1) she did not evaluate Dr. [Chamberlain's] opinions under the treating physician rule, and (2) she did not provide good reasons for any analysis she conducted of Dr. [Chamberlain's] opinions under the treating physician rule." *Chapman v. Comm'r of Soc. Sec.*, No. 3:19-CV-00205, 2020 WL 3971402, at *3 (S.D. Ohio July 14, 2020). (citing *Hargett v. Comm'r of Soc. Sec.*, No. 19-3718, 2020 WL 3833072, at *4 (6th Cir. July 8, 2020) ("[A]n ALJ may not summarily discount a treating-source opinion as not well-supported by objective findings or being inconsistent with the record without identifying and explaining how the substantial evidence is purportedly inconsistent with the treating-source opinion.")).

In responding to Plaintiff's statement of errors, the Commissioner glosses over the first requirement, emphasizing that the ALJ provided good reasons for discounting Dr. Chamberlain's opinion because it is inconsistent with the record as a whole and Dr. Chamberlain's own treatment notes. (*See generally* Doc. 9 at 5–15). But the Commissioner's "good reasons" argument is premature. Indeed, "[t]he ALJ did not mention the treating physician rule or the legal criteria applicable to determine whether Dr. [Chamberlain's] opinions were due to controlling weight under the treating physician rule." *Chapman*, 2020 WL 3971402, at *3. And, "[b]ecause of these omissions, there is no way to ensure a meaningful review of whether the ALJ evaluated Dr. [Chamberlain's] opinions under the correct legal criteria necessitated by the treating physician rule." *Id.* (citing 20 C.F.R. § 404.1527(c)(1)–(6)) (noting that "[t]he ALJ improperly reduced the two-step evaluation procedure mandated by the Regulations into solely consideration of the remaining factors in the Regulations, such as 'supportability' and 'consistency' factors").

But, even assuming *arguendo* that the ALJ properly performed the controlling weight analysis, her explanation for discounting Dr. Chamberlain's opinion does not constitute good reasons under the Regulations. As explained, to satisfy the reasons-giving requirement, "[t]he ALJ

must identify the specific evidence in the record that supports a finding that a treating physician's opinion was inconsistent with other substantial evidence in the record and apply the factors listed in 20 C.F.R. § 404.1527(c)(2)—length of the treatment relationship, frequency of the examination, nature and extent of the treatment relationship, supportability of the medical source, consistency of the medical opinion, specialization of the treating physician, and other important factors." *Davis v. Comm'r of Soc. Sec.*, No. 2:17-CV-995, 2020 WL 1305030, at *7 (S.D. Ohio Mar. 19, 2020) (citing *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009)). At base, an ALJ must "build an accurate and logical bridge between the evidence and the result." *Foster v. Comm'r of Soc. Sec.*, 382 F. Supp. 3d 709, 717 (S.D. Ohio 2019) (quotation marks and citations omitted). The ALJ's analysis of Dr. Chamberlain's opinion fails to satisfy this requirement.

In discounting Dr. Chamberlain's opinion, the ALJ relied on a handful of purported discrepancies between Dr. Chamberlain's own treatment notes and the record as a whole, including that Dr. Chamberlain recommended "only conservative modes of treatment" for Plaintiff's pain and that the "MRI findings reveal[ed] evidence of only mild disc desiccation at L2-L3, and no significant spinal canal stenosis or neural foraminal narrowing." (Tr. 26). But, as noted above, Dr. Chamberlain, despite these imaging results, consistently found that conservative treatments failed to adequately address Plaintiff's chronic lower back pain, and as a result, referred him to a spine specialist and sought a second opinion regarding other, less conservative options. (*See, e.g.*, Tr. 653 (seeking second opinion "[d]ue to failure of multiple conservative treatment options without surgical indication" to consider "potential neuromodulation or intrathecal pain pump"); Tr. 421 (recommending Plaintiff undergo a medial branch block "as he has failed all other conservative options")). And, while not required to explicitly discuss each regulatory factor, the ALJ failed to discuss the other relevant criteria, including, for example, the frequency with which

Dr. Chamberlain treated Plaintiff. *See* 20 C.F.R. § 404.1527(c)(2). While none of these flaws by themselves warrant remand, when taken as a whole, the Undersigned is unable to trace the ALJ's logic behind discounting Dr. Chamberlain's opinion. Substantial evidence fails to support the ALJ's decision as a result. *See Rogers*, 486 F.3d at 243 (explaining that one of the purposes of the good reasons requirement is to ensure meaningful appellate review of the ALJ's application of the treating physician rule).

In such a situation, "the Court must determine whether to remand the matter for rehearing or to award benefits." *Woodcock v. Comm'r of Soc. Sec.*, 201 F. Supp. 3d 912, 923 (S.D. Ohio 2016). "Generally, benefits may be awarded immediately 'if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.'" *Id*. at 924 (quoting *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994)). A court should only award benefits in a case "where proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where proof of disability is overwhelming." *Id*. The Undersigned finds that proof of disability is not overwhelming. *See id.* Upon remand, the ALJ should properly consider and discuss the opinion of Dr. Chamberlain and provide an explanation that is consistent with the Regulations when assigning weight to the opinion.

**IV. CONCLUSION**

Based on the foregoing, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's non-disability finding and **REMAND** this case to the Commissioner and Administrative Law Judge under Sentence Four of § 405(g).

## V.  PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:  July 21, 2020                             /s/ Kimberly A. Jolson
                                                 KIMBERLY A. JOLSON
                                                 UNITED STATES MAGISTRATE JUDGE